Our next case for argument is 23-1223. I'm gonna say Philips, because I don't know how to say the first word, which someone will tell me later, versus Quectel Wireless. Mr. Littman. How do you say that first word? Coninklijke, I think, that's my best. It's your client, right? Yeah, yeah. You should know. Yeah. Know how to say their name? Briefs all use Philips. Yeah, yeah, we always say Philips. I know, but I'm supposed to say the whole name, and I don't know how to. Thank you, please proceed. Good morning, your honors, may it please the court. Oh, wait, before I do, I forgot yesterday and today. We are so grateful and lucky to have Judge Mazant from the Eastern District of Texas joining us today. It's a real treat for us, and we appreciate his willingness to serve with us. Thank you. Sorry, please proceed. Yeah, good morning, your honors. Good morning, Judge Mazant. Thank you for being here. Kevin Littman on behalf of Philips, or Coninklijke Philips. We are here today because the board found in the underlying enterprise review that certain claims of the 814 patent are invalid based on obviousness, based on a combination of this Choi reference, specifically the background section of that reference, and the Gollum-Moody reference. Okay, so for me, I have to stop by asking a procedural question. There are three implementations that the board looked to. If I agree that there was substantial evidence for any one of those, do you lose? I think that's correct. You have to get past all three? All three, yes. Okay, all right. So don't bother with the first one because I actually agree with you, and I mean, my colleagues may not, but that means you gotta get by two and three. So don't start with your easy ones, start with your hard ones. All right, go ahead. So yeah, I'll turn it into implementation number two. So I think the easiest way to understand is if you have the briefs in front of you, there's a chart on page 48 of the briefs, I think, and that's taken from Mr. Lanning's testimony, but you can see what, in that second page, 48 of the opening brief. So if you see that chart, it provides kind of an easy way to analyze the situation. So under this implementation, you have... You think this is an easy way to understand? Yeah, well, yeah, you seem like, I mean, this stuff is complicated, let's be fair about that. But the chart sort of at least dumbs it down a certain amount, let's say, put it that way. So you can see on the left side, there's the control channels, right? And so you can see that there's gonna be four control channels that are used in any one given TTI. And so that's a key thing for both this implementation and the second one is this underlying admitted situation where within a given TTI, within a time interval, once a channel is used, you can't use that same channel again. And so that's the key thing, I think, to understand for both the second implementation and the third one. And what the chart helps you see is that there's basically these eight choices. So you can use, if you use channel one, for example, on the top of the chart, right? Then you're gonna have these, those two bits in the second column, that those are just another way of saying one, right? So zero zero is just a binary way of saying one, zero one is a binary way of saying two, right? So that's just the binary way of basically saying this is the information that's conveyed by using that channel. And then that bit three value, that's the dynamic one. And so each time you use the channel, that dynamic bit is gonna either be zero or one, that's what binary means, right? And so basically it breaks it down into these eight scenarios. But so once you use a channel to go to one UE, that's the user equipment. So let's say you have three UEs. If you're sending, if you're sending channel, in the brief, for example, you use channel two on page 50, right? So if you use channel two, it's gonna go read, showing in the chart, if you use channel two to send it to that UE. You are so deep in the weeds right now. Okay, okay. How about you tell us, like step back for a sec, and tell us what you think this shows without going through it. Just start from a why this implementation satisfies which particular concern. Start bigger picture, please. Yeah, bigger picture is that you can't assign all the codes to each UE within a given TTI. So the TTI is a timeframe. So within that one timeframe, because you can only use a channel once within a timeframe, once you use that channel up on one UE, you can't do it to the next. So basically you're restricted once you use, say, the number of codes that are gonna be used for one UE. The next UE can't use the same number of codes. And it can't use the other number, too. So here it can't use five, sorry, it can't use three codes, and it can't use four codes on the second UE. And so the most, the basic example that we give is let's say you have three UEs. So there's three, you know, cell phones out there. Each of your honors has a cell phone, right? And the base station is trying to send information, trying to send codes to it. And let's say you're doing the same thing, so you have the same data channel quality, the same data requirements. You would think that the natural way to do that would be to send five codes to each. But once I send five codes using channel one to you, I can't, again, in that same TTI, send five codes, you know, to them. But just to move back even further from the details, my understanding of this is that this turned out to be a battle of the experts. And it came down to an issue we often see on motivation. Your expert saying that this would have been problematic, this would have discouraged one skilled in the art from making the combination. And the other expert said, yeah, but there were advantages. Advantages for power efficient, for power and transmission resource savings. And those are equally important. So how did the board err on a substantial evidence review by at least crediting, it didn't discredit your expert in terms of what he was saying, but weighing the benefits versus the burdens and coming out and saying, I'm crediting this expert that yes, there would have been these benefits and that would have been sufficient to establish a motivation. One is that, why is that wrong? And two, why is it wrong as a matter of law that the board was within its rights to do this balancing and say there was a sufficient motivation in any event? Yes, and so the first part I think I would say is if the board is not understanding the facts quite correctly and understanding what the drawbacks are, then it can't correctly weigh the experts. So without the underlying, without getting the underlying facts. I disagreeing with what I laid out and simplistic and probably non-correct technical thing that your expert said, these would have been the burdens if you had done this. And the other side said, yes, but there would have been savings, power savings and other benefits to that. That's where you get to the second part is that if you assume we're correct and that the board is not, right? And in terms of these factual issues with the drawbacks, I think ultimately what you're left with- No, we can't assume you're correct because Dr. Wells said there are measures that could be taken to mitigate the lockout. Locking out was one of your big problems. And so the board could have credited that too. So we can't, we don't start from the premise that we assume you're correct, okay? We have to start from, is there substantial evidence in this record to support what the board found? And what Judge Prost is pointing out is that Dr. Wells testified that what you're saying is bad isn't as bad as you're saying it is because there are ways to mitigate it. And there are other benefits, other than the flexibility that would be achieved. And I don't, that's kind of really hard to get around on a substantial evidence burden. So we can't start by assuming everything you said is correct because their expert pointed out that he believed at least, or he opined, that there are ways to mitigate the concerns you were talking about. And that's why a skilled artisan would have been willing to make the combination and go with the trade-offs. Right, I think that's correct for implementation number two and in particular implementation one. I think there's that whole issue of the channels. But so implementation two, I think you're right. I told you you don't have to talk about it. Yeah, yeah, okay. But so yeah, to be fair, I think what you're left with is at the end is you have their experts saying, okay, there is the drawback in terms of lack of flexibility, but you would get these power savings, right? And so he basically says in different ways you have power savings. But what he never identifies is what are those power savings, right? So if you don't know how much power you saved, how can you actually do any weighing? Oh my God, that's substantial evidence. This is a substantial evidence review. What you're talking about is, oh my gosh, we don't know how much the power savings, that's not, we don't get to think about that on appeal. That's not where we live. I disagree respectfully, Your Honor. I think the case law says if it's all based on conclusory expert testimony, that is not substantial evidence. And I would suggest that that is conclusory, just to say that the power benefits outweigh the drawbacks. This is more than that. The weighing, you just made a statement. They didn't just say that. They analyzed it, and there were several pages. I think I'm on the right page, which is 30, 31, right? I mean, they discussed the testimony. They discussed it. I mean, maybe they're wrong, but based on the substantial evidence review, it wasn't just one sentence. Bottom line, we believe him and not him, and so we're moving on here. Well, I see, I think it looks like that, maybe when you read the opinions, sort of at a high level, but if you understand kind of both the drawbacks and that they weren't sort of looked at correctly, and then you understand what the weighing eventually comes down to, I think you can, the gist of it is that they're just saying that, well, we think that he said the power savings were enough compared to the drawbacks of the lack of flexibility in the codes, and that's where it comes down to. I think at the end of the day, that's conclusory, and you can say it in a more detailed way, but I think that's essentially all that's being said there. Like Dr. Wells says, well, the power savings would do four different things for you, but ultimately, he's only saying, like, a person of ordinary skill would be motivated by power savings to do those things, and here's the underlying reasons why you'd do it. So I think there's some clever, you know, wordsmithing in terms of how to say it, but I think at the end of the day, it's really just a conclusory opinion that says, yeah, you get these power savings, I can't identify what they are, but they'd be enough to do anything, to change UMTS entirely, you know, to. Did he say, I can't identify what they are? Well, no, he didn't say I can't, but he just doesn't. Okay, and did your expert, or did you all point out that the power savings he's claiming are either nonexistent or minuscule compared to? I think that's right. I mean, I think, Dr., sorry, Mr. Vann. Where is your evidence that contradicts his testimony, which I think is, his testimony is on 2193. So where is your evidence that contradicted that? Or that questioned and suggested it was conclusory and should be rejected for that reason? And not your argument, but your testimony. Yeah, I think it is 2563, 2564, for example. Is this Lanning? Lanning, yes, of the appendix pages I'm giving you. Paragraph 156? Yeah, paragraph 156. It doesn't seem to say anything about the power savings. Yeah, I think it's into 157, I guess I would say. So for example, 157 says a person learning a skill in the art would not combine continuity and choices as suggested in the second example, because doing so would create unnecessary and serious restrictions on the system capacity. That doesn't, but no, what that does not say is at all what you just said before, which is that his, Dr. Wells' explanation of the quantity of power savings was too conclusory and should be rejected. You haven't even shed, it doesn't seem to me, from the record, reason to question that his assertion of power savings is legitimate, i.e. something an ordinarily skilled artisan would have taken into account. To call that into question for substantial evidence purposes, you'd have to have something that points to either it's minuscule and therefore a skilled artisan wouldn't have looked to it, and then you can say, look, his testimony's conclusory, his testimony doesn't quantify it, and when we quantify it, it's so small as to be negligible. Like, you have to have something, you can't just say, I mean, if he says there's a power savings and he's an expert, and your expert doesn't contradict that, then, I mean, under substantial evidence, I don't think we have a choice but to allow the board to make that call. Yeah, I think the other place is on paragraph 142 and appendix 2557 as well. So, for example, in that paragraph, this is where Wright refers to the other one, monitoring the four control channels puts an unnecessary burden on the UA with very little or no benefit. And so he's saying that, he's essentially saying there that the benefit, which is supposedly the power savings, is small, right? With all due respect, that's more conclusory because it doesn't even say, it doesn't even address the specific benefits that Dr. Wells is attributing. That, what you just pointed to, is more conclusory than the thing you're alleging is conclusory. But we don't have a burden of proof, right? I mean, they need to satisfy the burden of proof, right? And they can't do that. Just to be clear, we're on appeal and you're the appellant. So you have to establish the error below. So you, at this stage in the process, you have to prove that the board didn't have substantial evidence for what it did, not the other way around. And I think what I'm saying is that they didn't have substantial evidence because they rely on conclusory testimony. I don't think you can get around relying on conclusory testimony by saying, well, the other expert is as well. You're an attorney. Like, you don't have evidence to back that up. At least you haven't pointed us to any. That it's conclusory. Yes, he articulated a particular benefit, power savings. You're standing here complaining he didn't quantify the amount of power savings. But you don't actually have any evidence that says there's reasons a skilled artisan would want it quantified. He says there's power savings. That's a legitimate benefit. You didn't even question it anywhere. Well, I think the pair of 142, he did question it. But I mean, I know you're saying that it's conclusory. But I mean, I respectfully disagree. I think that they- He doesn't even reference it. He doesn't even use the words power savings. He doesn't even use the word power in any of those paragraphs. Right, well, because he's talking about the overall burden on the system. So maybe he should have articulated that in a better way, but with his word choice, I guess. But I think if you're placing an overall burden on the system, I think it's got to involve power issues and I think that was sort of implicit in what he's saying. But perhaps he could have used those extra words. You clearly know your tech really well. So I don't want you to think, I think, otherwise. This is the substantial evidence review standard. We don't make decisions in the first instance and we don't know the tech as well as you do. I do appreciate that, but I do think it comes down to the case law that says that substantial evidence is not satisfied by conclusory testimony. I think that's ultimately what they relied on. Okay, let's save you a little bit of time for rebuttal. Mr. Courtney. Thank you, Your Honor. Rob Courtney from FISH for QECTEL. Counsel, if we find that the first implementation or version isn't supported by substantial evidence, how does that impact the case? I don't think the record would support that, but obviously that's the court's determination. I'm not saying they disagree, but I'm saying that we would then proceed, as Chief Judge Moore suggested to my colleague, to the second and third variants. What about the PTAB's findings? What about some of the dependent claims? That the PTAB made findings for claims five, seven, 10, and 31 that dealing with the issue of you need more than four channels. So what do we do with that? So I think at this stage, there is no dispute that the two references, Choi and Gallimudi, have all the necessary technology, right? Everything's there. In the, we're at the reason to combine stage. So you are correct. For that first combination, there are dependent claims that are under discussion. I think were the court to say there was not sufficient cover there, because the hypothetical combination would not practice, I think there would need to be either reversal or remand, depending on the nature of the court's objection to that first hypothetical. If it's based on, you need more than four channels. So, I mean, Gallimudi. That's what the PTAB found for those dependent claims. Right. So, I mean, I would mention for the court's benefit, Gallimudi expressly avoids ever saying UMTS is limited to four, right? It directs the reader towards. Can I just follow up? I just want to make sure, Mr. Courtney, that I understand. Are you telling me, like, I asked him, what if I find implementation two and or three are substantial evidence, and I got the impression that you win and the case is over, I appreciate your candor. You always have to be candid. You get major points for candor. Are you now telling me that if I have a problem with implementation one, I have to vacate at least as to some claims? So, I think I am telling you that, because I appreciate the candor, you gotta be candid. Like, that's a good thing. Right, as the court knows, obviousness always turns on this hypothetical combination of elements. We posit a hypothetical combination and we analyze it. And if the court finds that the first posited combination can't survive, then I think there are dependent claim problems, because the board is relying on that hypothetical combination. And there was nothing in this brief that said everything stood or fell together or anything? Well, I mean, we are the FLE. So, yeah, I would say that we are the FLE. So, the parties have treated these as rising and falling together. I do think, however, that that first combination, there is not the defect that the chief judge, with all respect, expressed skepticism about that first combination. So, I would like to talk about that. Yep, I think that would be really useful. So, the issue is, I think as the chief judge and the other questioning for my colleague illuminated, there's not a lot of dispute that were people, were artisans in 2006 to make the first combination? Some efficiency could be saved. Warren Choi, point us to Warren Choi that says that you have more than four channels to get a three-bit reduction. Choi does not say that. Golamudi says that. So, point me where then, Golamudi. Yeah, that is in, I'll direct you first to figure one, which is on appendix 1746. And Golamudi, in that, says, you know, we can have one channel, two channels, all the way up to M, right? And I think it is. Wait, slow down. What page, 18? 1746. Oh, 1746, okay. 1746, and figure two. Figure one. Oh, figure one. Okay. And 1746 is in the center. They're saying, I mean, how many channels are we going to monitor? We've got one, two, all the way up to M. And I think that is more than sufficient under a sufficiency of the evidence standard to establish that a skilled reader could read that and say, okay, Golamudi is not expressing a limitation. He's in fact, when I read the rest of Golamudi's teachings, proposing that the more channels you monitor, the more bits you can save. Is that all you have, or some other site reference? That is not all I have, and I'm glad you asked. Dr. Wells, right? Dr. Wells discussed this in the text. In the specs or anything, anything here in the patent that, other than Dr. Wells? Okay, Dr. Wells' testimony is evidence that is relevant to obviousness. I understand, but I'm trying to see in the written, in the patents, is there something that illustrates more than four? Within this patent, I think, you know, we have these references to log two M, not log two four. That's in 1748, column three, line five, and going on. He says, you can configure for M equals four, but then he's illustrating your... Wait, I'm sorry, you're just going too fast for me. Column three, line five, that says, similarly, if each user is configured to monitor M equal four, HS channel. Yep, so he's saying four is an option, but... It says M dash four. Doesn't that mean a number up to four? Isn't that like, if I say one dash four, that means somewhere between the number one and the number four? So that's not how Dr. Wells read it. That's not how the board read it. I think what this is saying is, we're illustrating one example is four, but to find out how many bits you're going to save, you're going to take the log two of M. He doesn't just say, oh, it's four, so you save two bits, or you can't save more than two bits. There's no statement of restriction like that in Gallimaudi. Gallimaudi is saying, take however many channels you're going to monitor, and take the second logarithm of it, and that's teaching you how many bits you're going to save. I'd also direct Judge Mezant, thank you, to figure two on page 1746. And figure two, we see that... What about figure one? I mean, not figure one. What about column one, line 65 of Gallimaudi, which says, each user is capable of monitoring up to M-4 channels. What about that? Isn't that up to four? I mean, what else do the words up to mean in that situation? So, and actually, Chief Judge Moore, I'm really glad this came up, because I think it's an error that runs throughout the briefing from Phillips. In this background section, Gallimaudi is describing the current technology as of his authorship, which is 10-6. So up until, so does that mean, are you going to now tell me that that means that up, basically the prior art, the background section, could only do up to four channels? It says up to four in that text, right, which is describing the background. Now, technology advances, and the obviousness inquiry looks at, okay, let's say we were designing the next generation. We're going to 4G, 5G, 6G. Could it be more than four? And figure two, I mean, we've discussed figure one, we've discussed column three. Figure two shows six. Page 1746, we have the HS SCH channel numbers on the top, element 40, and it's illustrating six being monitored. So Gallimaudi is literally proposing okay, four is common, we all like four, we're experienced with four, maybe six, maybe more. There's efficiencies to be gained if we do that. Are there trade-offs? Absolutely. Dr. Wells, you know, Chief Judge Moore, Judge Prost, the questioning established, Dr. Wells did not hide from the fact that there are some trade-offs. I do think the argument from my counterparts maybe overstates those trade-offs. And we would submit, and the board correctly found, that those trade-offs are not of a kind that would dissuade a person of skill from pursuing Gallimaudi to modify CHOI. In fact, I mean, Gallimaudi is literally proposing to the field, maybe UMTS could be tweaked. Maybe there's something here that we should consider. And before I leave Gallimaudi, I do wanna talk about Dr. Wells' testimony. Dr. Wells, as I think Judge Prost said, he's an expert, he's coming in. He is providing to the board, and indirectly to this court, testimony from one who has experience in this area to help the board move beyond the bare text of the references to understand the perspective of an ordinary skill in the art, person of ordinary skill in the art. And he stated, and the board expressly relied there on, that within the field, for the purposes of moving forward, he was not able to see any hard and fast restriction against moving away from four monitored channels. And he explained why. He said, you know, four is a convenient number. We've certainly done it that way in the past, but if there were a reason to move away from four, Dr. Wells' view was that a person of skill would have pursued that. And that is at the center of all of the arguments surrounding that first variation. I do think also, the statements that Phillips is presenting about how pursuing variant one would require this massive refit, and we'd have to replace everyone's handsets and replace everyone's base stations, that's not in the record. Their expert, Mr. Lanning, did not say that. I'm struggling a little bit. I don't see you pointing to figure two in your red brief at all, under this implementation, or for Gallimondi anywhere. Do you, did you do that? Did Dr. Wells talk about it? Is it in the record? I don't see the board also citing figure two. So I don't see anybody, figure two, honestly, you're coming out of the blue for me on figure two. So was that in your petition? Did you rely on it? Did the board cite it? Is it somewhere in this record? Did you make the argument? Because you didn't make it in your red brief. I just went back and read. It's not in the red brief, that's correct. You didn't make it, you did not make the argument to us that we should rely on figure two in Gallimondi to establish the more than four channels for implementation one. Did you make that argument? Did Dr. Wells make that argument? Is it in his testimony? Did Dr. Wells rely on figure two? No, is what he said. I think the answer is no, I will say. So your expert didn't rely on figure two. You didn't argue figure two to us. Did the board find, because I'm reviewing the board, that figure two provided a disclosure of more than four channels in Gallimondi? It did not. Did you argue it in the petition? Because as we all know after SAS, I mean, this is a petition case, right? Sure. Yeah, after SAS, I can only rely on what you argued in the petition. Nobody, not the board or me, can go beyond that. In the petition, did you argue that figure two satisfies this element? We did not. I mean, in complete honesty, we relied on Dr. Wells. I love your honesty. It makes me like you as an advocate tremendously. Just makes the case harder. But that's not your fault. So you're stuck with what was done. With respect, I think this case only becomes harder with respect to figure two. I mean, do you believe I can now rely on figure two as the basis for establishing something that the board, when it wasn't ever referenced to the board, when it wasn't argued, when your expert didn't opine on it, and it wasn't even argued to me, do you think now I, at the appellate court stage, can make a fact finding that figure two discloses this? So this court reviews this entirety of the record, right? Now, the board did not rely on it, and I think that this court can certainly say the board did not rely on figure two. However, when reviewing the entirety of the record- Okay, wait. So the entirety of the record, you think, for petition purposes, if, for example, three embodiments are disclosed in a reference, and you say embodiment one provides the elements of my claim, but you never mention embodiment two or three, you think the entirety of the reference and what I can rely on to affirm the board, it might be that I conclude the board's completely wrong and figure one doesn't disclose it, but I can conclude nonetheless that I can go find it in other places in the references. Even though they weren't argued, those were not the embodiments that were pointed to, I can nonetheless do that? Okay, I think if we're hypothesizing a situation where this court discards all the rest of the board's fact finding, all the experts, everything else, and just says only figure two, no, Chenerey doesn't permit that, right? We can't do that. Well, it's not just only figure two, we can't say also figure two, right? We can't use figure two. But you use, I think everybody is agreeing on what exists, but your brief at 27, 28, 29, you did rely on, you started with figure one with us, and that was included in, I don't remember if that was precisely called out by the board. So you have figure one on page 28. So what can you do with figure one? I mean, you started and then you moved over to figure two, and it seems like we were more readily embracing figure two than figure one, but you still got figure one left. Right, so figure one is where we began, and I think figure one alone is sufficient to support the board's determination because it uses this concept of M, right? That runs throughout Golomudy, that the number of monitor channels is an integer M, and Golomudy encourages those of skill to experiment with M, and the number, the amount of bits saved will be the second logarithm of M. So are there implementation difficulties in that? Possibly, but it is something that's under discussion. I do also think Dr. Wells' discussion that persons of skill would not find the move from four to eight if we're thinking about a clean move, we're moving from an old technology to a new technology. As a technical matter, his testimony that a person of skill would not be dissuaded from the proposed combination is entitled to wait. It is evidence in the record. It is sufficient to support the board's determination. The standard here is we're looking for a record that's reasonably adequate to support the fact-finding. This court does not reweigh facts, as I think the whole panel has noted, and Dr. Wells' testimony, which the board expressly credited, does expressly address this issue. I see I'm out of time. What is Dr. Wells' testimony? Are you talking about paragraph nine on 2185? I'm out of time. May I answer? Of course. Okay. So for the first variation, the board cited, yeah, 21- Paragraph nine on 2185? 2185 and 86, yeah. And what does he say about the state of the art and how a skilled artisan would have gone above four despite Gollum Mundy's statement that at the time the art was only capable of monitoring four? Right, so paragraph nine, as we were just discussing, he says, a person of skill would have recognized, while this is how most UMTS systems were implemented at the time, this was not a hard and fast rule for all UMTS systems. Now, that is a statement of opinion by one qualified to make it. So that is evidence. The court can rely on it, and this case did rely on it. This was also not a hard and fast rule, and he doesn't point to anything at all. Like, he doesn't say, here's some examples. The record is what it is. He said, in my experience, this is how we view this thing. He was examined on this at deposition. And I'll direct the court to appendix 2738, lines five through 17, where Dr. Wells- Can I take you back to, I'm sorry to interrupt, but I'm just, I'm behind the curve, too. It's going too fast for me, but on paragraph 10, this is Dr. Wells, 2186, right? He does say, as I described in my initial declaration, a poseda would have recognized, based on the disclosures of Gallimandi, that setting the value of M to eight, such that, so he does discuss the Gallimandi and setting the M to eight, right? He is, and I want to be clear, he is saying a person of skill reviewing Gallimandi would have understood that if that person hypothesized the system that monitors eight channels, you would save three bits of payload. That's the second logarithm of eight is three. I don't want to suggest that he's saying Gallimandi expressly teaches setting the value of monitor channels to eight, right? It says setting the monitor channels to M. Dr. Wells is saying, to a person of skill, if you want to save two bits, you do four. If you want to save three bits, you do eight. If you want to save four bits, you do 16. That's how second logarithms work. Okay, anything further? No, thank you. Let's let Mr. Littman have two minutes, though, for about a minute.  Council, I need to start off, just ask, because you answered the chief's question a certain way, so I didn't ask you the question. I asked the appellee. I didn't expect the answer, because I thought maybe I was wrong on my analysis, and it's something my clerks raised to me this morning, so it wasn't something I had thought about, because I thought your answer was what I thought, too. It didn't matter, as long as the other two implementations were met. So what is your answer now to whether the chief asked you that question? The issue is regarding these dependent claims. Dependent claims, okay, yeah, because I don't think I was asked that question. So you weren't asked that question. You were asked the question, though, would it matter if two and three, and you said yes, and I agree that's true to claims one to 27, independent claims.  Yeah, to be honest, I mean, obviously, the focus of the briefing was on the first claim. I think I'd have to take a closer look than what I have at this moment to better understand. I'm sorry, I can't hear you. I'd have to take a closer look at those claims. Again, I don't have the moment here to appreciate that, and our understanding was that it was, my answer would be the same, that we were thinking it was any of those three could satisfy, and certainly with claim one, where the focus was on this, but I'm not sure exactly how that affects the dependent claims I'm sitting here right now. I will say, I was gonna say I'm rebuttal to the same point about this figure, too, so I won't spend too much time on it, but I think it's clear that that was raised for the first time in oral argument today, and that's improper to rely on, and I think you can look at the TQ Delta case, for example, 942, F3D, 1352, 1358. A review of a patentability determination is confined to the grounds on which the board actually relied. I will say the other thing that came up here with this first implementation is that it seems like Quetel is now admitting that UMTS had the UEs only monitor four channels, and that, I don't think, was reflected in the briefing, underlying it, or in the appeal briefing, and I don't think it's reflected in what the board thought. The board's opinion was UMTS allows the UEs to monitor more than four, and that's reflected on page 27 of the brief, and so what the board did was it said, okay, well, I'm gonna look at CHOI, paragraph 123, from my understanding of how UMTS worked, and then there's this kind of, in our opinion, wrong reading of that paragraph to determine that it actually allowed it, but UMTS is a standard, right? There is no two UMTSs, there's no multiple UMTSs. It's a standard that was created by the 3GPP organization, and it either does it or it doesn't, and I think what we heard in oral argument today is an admission that under that standard, the UEs only monitored four control channels, and so you would have had to modify what the worldwide standard was to achieve that implementation. Okay, I thank both counsel for their argument. This case is taken under submission.